UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUAN M. GUAJARDO, JR.,

    Petitioner,                                 Civil No. 2:14-CV-10260
                                            HONORABLE VICTORIA A. ROBERTS
v.                                           UNITED STATES DISTRICT JUDGE

LLOYD RAPELJE,

    Respondent.
_____/

**OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS, DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND GRANTING PETITIONER LEAVE TO APPEAL *IN FORMA PAUPERIS***

Juan M. Guajardo, Jr., ("Petitioner"), confined at the Saginaw Correctional Facility in Freeland, Michigan, filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his conviction for second-degree murder, M.C.L.A. § 750.317, possession of a firearm by a felon, M.C.L.A. § 750.224f, and two counts of use of a firearm during the commission of a felony (felony firearm), M.C.L.A. § 750.227b.

For the reasons that follow, the petition for writ of habeas corpus is DENIED.

**I. Background**

A jury convicted Petitioner in the Saginaw County Circuit Court. This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith*, 581 F. 3d 410, 413 (6th Cir. 2009):

Defendant's convictions arise out of the shooting death of Kevin Powell that occurred about December 17, 2010. The shooting occurred at a boarding house in Saginaw that defendant had signed a contract to purchase a few days earlier. Powell, who was a large, heavyset man, was a tenant at the boarding house. Several days before the shooting, the police refused a request from a man named "Juan" for assistance in evicting Powell because "Juan" could not produce a valid eviction notice. A police officer testified that he told "Juan" to call the police if the subject, i.e., Powell, became "assaultive." The officer testified that "Juan" responded by stating that no call would be necessary because "he takes care of his own." Defendant testified that his friend had made the call and impersonated defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Before the shooting, defendant, Delano Williams, and John O'Valle moved some of defendant's belongings, including a rifle, into the boarding house. According to defendant, early in the day Powell shouted at him. Defendant refused to have a conversation with Powell until Powell stopped shouting. Powell retreated to his room. Later that day, defendant and Powell had a calm discussion; Powell offered to talk and have an alcoholic drink with defendant in his room provided that defendant purchase the alcohol. Defendant agreed, and left the boarding house to purchase alcohol. There was conflicting testimony regarding the events that followed.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

[A]ccording to Williams, sometime thereafter, while he and O'Valle sat at a table, defendant got the rifle from underneath the mattress, walked to Powell's room, knocked on the door, asked Powell if he wanted some soup, and then fired the gun. Specifically, Williams explained, "I heard the door go, you know, like somebody touched the knob and gonna pull it open and then just heard a bang."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

[W]illiams did not clarify why defendant confronted Powell with a rifle other than stating that Powell "went too far when he decided he wanted to touch me" and that Powell was "too big." He agreed that defendant "got up from the table" unannounced, got the rifle, and went to Powell's room with it.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

According to defendant, sometime after he and Powell conversed, while he was eating with O'Valle, he heard a "ruckus in the kitchen" and then saw Powell choking Williams. Defendant explained that he instructed Powell to release Williams and Powell complied. However, defendant testified that Powell stated, "that's it ... I'm getting my gun. I'm killin' all of yous.... He said he was gonna kill us." Powell left the area and returned to his room. Defendant testified that, as Powell was going to his room, "I went under the

2

mattress and retrieved the gun and flashes of my dead sister was in the kitchen, and I'm seeing flashes of [Williams] dead in the kitchen, and I'm figuring he's gonna come kill us all." Defendant testified that he retrieved the rifle about three minutes after Powell went into his room. Defendant then proceeded to Powell's room with the rifle. Defendant stated that he asked Powell if he wanted some food and proceeded through the door into Powell's room.
*************************************************************
Defendant testified that he was scared of "gettin' killed." He explained that Powell was holding a "long black thing" that looked like the barrel of a gun when he went in Powell's room. However, defendant testified that Powell was "bluffing" and must have been holding a hammer that the police later found on his bed. Defendant testified that his rifle fired only once and he stated that he was "shocked that it went off. I actually thought that it was empty." He explained that he brought what he thought was an unloaded rifle to Powell's room to try and intimidate Powell and prevent him from "get[ting] his gun and kill[ing] all three of us like he said he was gonna do." Defendant agreed with the prosecution that his "sworn testimony to this jury was that this was an accident taking place at a time that you were in fear for your life."

*People v. Guajardo*, 300 Mich. App. 26, 832 N.W.2d 409, 410-412 (2013).

Petitioner's conviction was affirmed on appeal. *Id.* Petitioner did not file an application for leave to appeal to the Michigan Supreme Court.[1]

Petitioner seeks a writ of habeas corpus on the following ground: the trial court denied Petitioner his right to a fair trial when it refused to instruct the jury on self-defense and defense of others.

## II. Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

---

[1] *See* Affidavit of Larry Royster, Clerk of the Michigan Supreme Court. [Dkt. # 10-13].

3

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court explained that "[A] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S. Ct. 1855,

4

1862 (2010)(quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)(*per curiam*)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.*

### III.  Discussion

Petitioner claims that the trial court denied him his right to a fair trial when it refused to instruct the jury on self-defense and defense of others.

Respondent claims that Petitioner's claim is unexhausted because he failed to file an application for leave to appeal with the Michigan Supreme Court after the Michigan Court of Appeals affirmed his conviction.

Petitioner's claim is not merely unexhausted but procedurally defaulted. A habeas petitioner procedurally defaults a claim if he or she fails to raise it in an application for discretionary review with the state's highest court. *O'Sullivan v.*

*Boerckel*, 526 U.S. 838, 848 (1999). Respondent did not argue in his answer that the claim is procedurally defaulted. This Court will not enforce any possible procedural default, because respondent failed to raise the defense of procedural default in the answer. *See Benoit v. Bock,* 237 F. Supp. 2d 804, 807 (E.D. Mich. 2003). With the exception of the exhaustion issue, "the Sixth Circuit strongly discourages the *sua sponte* invocation of procedural affirmative defenses that were not raised by the respondent." *Id.* (*Citing to Scott v. Collins,* 286 F. 3d 923, 928-29 (6th Cir. 2002)). Thus, although the issue of exhaustion must be expressly waived by respondent, "the same is not true for the affirmative defense of procedural default." *Id.* Respondent's failure to raise the procedural default defense can be considered an implicit waiver of that issue. *Benoit,* 237 F. Supp. 2d at 807.

  The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack upon the constitutional validity of a state court conviction is even greater than the showing required in a direct appeal. The question in such a collateral proceeding is whether the ailing instruction so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even "universally condemned," and an omission or incomplete instruction is less likely to be prejudicial than a misstatement of the law. *Henderson v. Kibbee*, 431 U.S. 145, 154-155 (1977). The challenged instruction must not be judged in isolation but must be considered in the context of the entire jury charge. *Jones v. United States*, 527 U.S. 373, 391 (1999).

The Michigan Court of Appeals reviewed and rejected Petitioner's claim as follows:

> After a thorough review of the record, we conclude that there was no evidence that would have allowed a jury to find that defendant's criminal possession of the rifle was justified by an honest and reasonable belief that it was necessary for him to use deadly force to prevent imminent death or great bodily harm to himself or to another. MCL 780.972(1). Here, unlike in *Dupree*, defendant was not involved in a physical struggle with an intoxicated and armed individual. Instead, defendant pursued Powell into his room and shot him after Powell had abandoned the physical altercation with Williams and retreated into his room, a place where he had a legal right to be. Specifically, evidence showed that several physical and verbal altercations preceded the shooting. O'Valle confronted Powell with the rifle, Williams accused Powell of taking his watch, and defendant informed Powell that he would soon be evicted. Despite the contentious nature of the relationship between the men, Powell never produced a weapon or placed any of the men in danger of imminent death or great bodily harm. Indeed, when O'Valle threatened Powell with defendant's rifle, Powell physically took the weapon from him but he did not threaten anyone with it. Instead, Powell returned the rifle to defendant without incident. It was defendant, not Powell, who used the rifle as a deadly weapon.
>
> Additionally, although defendant testified that he feared for his life, there was no evidence that defendant had a reasonable and honest belief that the use of deadly force was necessary to prevent imminent death or great bodily harm. The reasonableness of a person's belief regarding the necessity of deadly force "depends on what an ordinarily prudent and intelligent person would do on the basis of the perceptions of the actor." In this case, considering all the facts and circumstances, an ordinarily prudent and intelligent person would not have found it reasonable to pursue Powell to his room, coax him to open the door by offering him food, and then shoot him. According to defendant, Powell and Williams were in a physical altercation a minimum of three minutes before the shooting. During this altercation, Powell did not possess any weapon and he did not pose a deadly threat to either defendant or Williams. In fact, according to defendant, when defendant put his hand on Powell's shoulder and told him to release Williams, Powell did so and then retreated to his room and closed the door. Although defendant testified that Powell threatened to get his gun and kill all three men, Powell returned to his room and closed the door and did not come back out of the room. Despite

7

> defendant's contrary claims, the use of deadly force was not necessary because threats of future harm do not constitute imminent danger for purposes of self-defense. Once Powell abandoned the physical altercation and retreated to his room and closed the door, he did not pose an imminent threat to defendant or anyone else in the boarding house in such a manner that the use of deadly force was necessary. Nevertheless, defendant retrieved a rifle from under a mattress in a back bedroom, waited three minutes, went to Powell's room, offered Powell food, and then immediately shot Powell. Indeed, according to his own testimony, defendant did not think the rifle was loaded when he brought it to Powell's room. Had defendant possessed a reasonable and honest belief that his life was in danger, he would not have brought what he thought was an unloaded rifle to Powell's room to confront him. In sum, defendant was the aggressor who initiated the deadly confrontation and he was not entitled to a self-defense instruction.

*Guajardo,* 832 N.W. 2d at 416-17 (internal citations and footnotes omitted).

The Michigan Court of Appeals also concluded that Petitioner was not entitled to a jury instruction on self-defense because he "did not advance a self-defense theory at trial[.]" Petitioner testified at trial that he did not intentionally shoot the victim but that the gun went off accidentally. *Guajardo*, 832 N.W.2d at 417-18. Accordingly, the trial court did not abuse its discretion in instructing the jury on Petitioner's accident theory but declining to instruct the jurors on self-defense. *Id.* at 418.

A defendant in a criminal trial has the right to "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). "[A] necessary corollary of this holding is the rule that a defendant in a criminal trial has the right, under appropriate circumstances, to have the jury instructed on his or her defense, for the right to present a defense would be meaningless were a trial court completely free to ignore that defense when giving instructions." *See Taylor v. Withrow*, 288 F. 3d 846,

852 (6th Cir. 2002).

A defendant is therefore entitled to a jury instruction as to any recognized defense for which there exists evidence sufficient for a reasonable juror to find in his or her favor. *Mathews v. United States*, 485 U.S. 58, 63 (1988). A state trial court's failure to instruct a jury on self-defense when the instruction has been requested and there is sufficient evidence to support such a charge violates a criminal defendant's rights under the Due Process Clause. *Taylor*, 288 F. 3d at 851.

Under Michigan law, one acts lawfully in self-defense if he or she honestly and reasonably believes that he or she is in danger of serious bodily harm or death, as judged by the circumstances as they appeared to the defendant at the time of the act. *Blanton v. Elo*, 186 F. 3d 712, 713, fn. 1 (6th Cir. 1999)(citing to *People v. Heflin*, 434 Mich. 482; 456 N. W. 2d 10 (1990)). To be lawful self-defense, the evidence must show that: (1) the defendant honestly and reasonably believed that he was in danger; (2) the danger feared was death or serious bodily harm or imminent forcible sexual penetration; (3) the action taken appeared at the time to be immediately necessary; and (4) the defendant was not the initial aggressor. *See Johnigan v. Elo*, 207 F. Supp. 2d 599, 608-09 (E.D. Mich. 2002)(citing *People v. Barker*, 437 Mich. 161, 165; 468 N.W. 2d 492 (1991); *People v. Kemp*, 202 Mich. App. 318, 322; 508 N.W.2d 184 (1993); *People v. Deason*, 148 Mich. App. 27, 31; 384 N.W.2d 72 (1985)). Under Michigan law, a defendant is not entitled to use any more force than is necessary to defend himself. *Johnigan*, 207 F. Supp. 2d at 609 (citing Kemp, 202 Mich. App. at 322). "[T]he law of self-defense is based on necessity,

9

and a killing or use of potentially lethal force will be condoned only when the killing or use of potentially lethal force was the only escape from death, serious bodily harm, or imminent forcible sexual penetration under the circumstances." *Johnigan*, 207 F. Supp. 2d at 609 (internal citation omitted).

The trial court's refusal to instruct the jury on the defense of self-defense did not deprive Petitioner of a fair trial; insufficient evidence was presented at trial to support the instruction. As the Michigan Court of Appeals indicated in it's opinion, the victim retreated to his room and was pursued by Petitioner. Petitioner argued at trial that the shooting was an accident and that he believed the rifle was unloaded, yet Petitioner claimed on appeal that he pursued the victim with a rifle to defend himself and others from being killed. The Michigan Court of Appeals also found that after the victim retreated to his room, Petitioner retrieved his rifle, waited 3 minutes, attempted to lure the victim out of his room by offering food, and then immediately shot the victim. The Michigan Court of Appeals found "[a]ccording to his own testimony, defendant did not think the rifle was loaded when he brought it to Powell's room. Had defendant possessed a reasonable and honest belief that his life was in danger, he would not have brought what he thought was an unloaded rifle to Powell's room to confront him." *Guajardo,* 832 N.W. 2d at 417. Furthermore, the evidence does not support Petitioner's claim that he was in imminent danger. "Once Powell abandoned the physical altercation and retreated to his room and closed the door, he did not pose an imminent threat to defendant or anyone else in the boarding house in such a manner that the use of deadly

force was necessary." *Id.*

Because there was no evidence to support Petitioner's self-defense claim, the trial court's failure to give instructions on the defense of self-defense did not deprive Petitioner of his constitutional right to due process. *Allen v. Morris*, 845 F. 2d 610, 616-17 (6th Cir. 1988); *Melchior v. Jago*, 723 F. 2d 486, 493-94 (6th Cir. 1983).

Petitioner was also not entitled to an instruction on self-defense because he testified at trial that the gun went off accidentally.

In *Taylor v. Withrow*, 288 F. 3d at 853-54, a case almost directly on point, the Sixth Circuit held that the state trial court's ruling that there was no evidence of justified self-defense, and its refusal to give self-defense instructions did not involve either an unreasonable determination of the facts or an unreasonable application of clearly established federal law, so as to warrant habeas relief, where the petitioner testified at his murder trial that he pulled his gun as a defensive act but that he did not intentionally shoot the victim to defend himself, and that, instead, the gun discharged accidently. *Id.* at 853-54. The Sixth Circuit noted that under Michigan law, a defendant cannot claim justified self-defense as a defense to homicide unless the defendant claims that the killing was intentional. *Id.* at 853(internal citation omitted). Petitioner's claim is without merit.

### IV. Conclusion

The Court denies the petition for writ of habeas corpus. The Court also denies a certificate of appealability. To obtain a certificate of appealability, a prisoner must make

a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254; *See also Strayhorn v. Booker,* 718 F. Supp. 2d 846, 875 (E.D. Mich. 2010).

For the reasons stated in this opinion, the Court denies Petitioner a certificate of appealability; he failed to make a substantial showing of the denial of a federal constitutional right. *See Siebert v. Jackson,* 205 F. Supp. 2d 727, 735 (E.D. Mich. 2002).

Although this Court denies a certificate of appealability, the standard for granting an application for leave to proceed *in forma pauperis* (IFP) is lower than the standard for certificates of appealability. *See Foster v. Ludwick,* 208 F. Supp. 2d 750, 764 (E.D. Mich. 2002). While a certificate of appealability may only be granted if petitioner makes a substantial showing of the denial of a constitutional right , a court may grant IFP status if it finds that an appeal is being taken in good faith. *Id.* at 764-65; 28 U.S.C. § 1915(a)(3); Fed. R.App.24 (a). "Good faith" requires a showing that the issues raised

are not frivolous; it does not require a showing of probable success on the merits. *Foster,* 208 F. Supp. 2d at 765. Although jurists of reason would not debate this Court's resolution of Petitioner's claim, the issues are not frivolous; therefore, an appeal could be taken in good faith and Petitioner may proceed *in forma pauperis* on appeal. *Id.*

## V. ORDER

**The Court DENIES** the Petition for Writ of Habeas Corpus and a Certificate of Appealability**.**

Petitioner is **GRANTED** leave to appeal *in forma pauperis.*

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: March 31, 2015

The undersigned certifies that a copy of this document was served on the attorneys of record and Juan M. Guajardo Jr. by electronic means or U.S. Mail on March 31, 2015.

S/Carol A. Pinegar
Deputy Clerk